## Bair Adoption Case.

Argued March 18, 1958. Before JONES, C. J., BELL, CHIDSEY, MUSMANNO, ARNOLD, JONES and COHEN, JJ.

*G. S. Parnell, Sr.,* with him *G. S. Parnell, Jr.,* and *Parnell & Parnell,* for appellants.

*William T. Pierce,* for appellees.

OPINION BY MR. CHIEF JUSTICE JONES, May 26, 1958:

This appeal is from an order dismissing the petition of Andrew and Patricia Maytea for the adoption of Gerald Bair, the son of George Wilson Bair and his wife, Carol Jean Bair. The petitioners are a childless couple in whose custody Gerald was placed on November 17, 1953, when he was not quite a year old, and with whom he has ever since lived at their home in Indiana, Pennsylvania.

The Mayteas instituted the adoption proceeding on December 20, 1954. They alleged in their petition that Gerald had been abandoned by his natural parents and that the abandonment had endured for more than six months, parental consent not being a prerequisite to a decree of adoption where abandonment is pleaded and proven. The applicable statute (Act of June 30, 1947, P.L. 1180, 1 PS §1 et seq.) expressly provides in Section 2 that "The consent of a parent who has . . . abandoned the child, for a period of at least six months, shall be unnecessary, provided such fact is proven to the satisfaction of the court or judge hearing the petition, in which case such court or judge shall so find as a fact." The hearing judge, after taking testimony, found that there had been no abandonment and entered an order refusing the prayer of the petition.

Abandonment is largely a matter of intention: *Hazuka's Case,* 345 Pa. 432, 435, 29 A. 2d 88. Whether it has actually occurred is primarily a question of fact to be determined from the evidence: *Davies Adoption Case,* 353 Pa. 579, 587, 46 A. 2d 252. As we observed in *Ashton Adoption Case,* 374 Pa. 185, 195, 97 A. 2d 368, "a finding of abandonment is an ultimate conclusion of fact deduced or inferred by reasoning from established facts." On appeal, an adoption case comes here as on certiorari in its broadest sense (*Harvey Adoption Case,* 375 Pa. 1, 5, 99 A. 2d 276), and we look

to see whether the record discloses legal error and if the action of the court below is supported by the evidence (*Harvey Adoption Case,* supra). If the evidence "legally warrants and impels" a conclusion of abandonment, this court will so declare even though the lower court has found to the contrary: *Davies Adoption Case,* supra.

The basic issue, therefore, raised by the petition in this case is whether the evidence justifies a finding that the child's parents abandoned him as alleged by the petitioners. If they have, a second pertinent inquiry at once arises as to whether the proposed adoption is for the best interest of the child: *Susko Adoption Case,* 363 Pa. 78, 81-82, 69 A. 2d 132.

As defined by the adoption statute presently in force, " 'Abandonment' means conduct on the part of a parent which evidences a settled purpose of relinquishing parental claim to the child and of refusing or failing to perform parental duties": Act of August 26, 1953, P. L. 1411, 1 PS §1; and as the abandonment must have continued for a period of at least six months in order to render parental consent to a proposed adoption unnecessary (Act of June 30, 1947, P. L. 1180), a recital of the material facts in the instant case becomes necessary.

On November 1, 1953, Carol Bair, Gerald's mother (then separated from her husband), was living with her four children at the home of her mother-in-law, Mrs. Louis Bair, at Smithport, Indiana County, Pennsylvania. George Bair, Carol's husband, was then living temporarily in the State of Indiana. At that time, Mrs. Patricia Maytea (George Bair's first cousin) together with her mother, Mrs. Twila Duncan, visited the home of Mrs. Louis Bair. During the course of the visit, Mrs. Louis Bair requested that Mrs. Maytea and her husband take Gerald into their home and care

for him. Gerald's mother, who was present, made no objection to her mother-in-law's proposal. The Mayteas, having considered the matter for several weeks, on November 17, 1953, took custody of Gerald who, as already stated, has ever since been living at the the Mayteas' home and has been supported, maintained and cared for by them exclusively.

On February 11, 1954, approximately three months after Gerald had been placed in the Mayteas' home, George and Carol Bair, then temporarily reunited, called there. On that occasion George demanded that Gerald be returned to him. Andrew Maytea responded resentfully, telling George to take the baby and leave. However, George made no move to do so. Andrew then added that the Bairs could not take Gerald unless they paid the Mayteas $500 for the expenses of his maintenance and support while in their care. At the hearing on the adoption petition, Mrs. Maytea testified, with reference to the Bairs' visit of February 11, 1954, that George Bair had said that he "came for his kid"; that his wife wanted the baby left where he was; and that "she [Mrs. Bair] disagreed with the husband, she said she wasn't going to live with him, and didn't know who was going to take care of the kids." The Bairs left the Maytea house that day without taking Gerald with them. Following this episode, George Bair never again made any profession of a desire to take custody of Gerald until after the institution of the adoption proceeding when, during the court hearing on the adoption petition (January 26 and 28, 1955), he stated that he wanted the custody of Gerald. Mrs. Carol Bair who was also present at the hearing did not take the witness stand in support of her husband's testimony. The bona fides of George's conduct in the premises is indeed open to very serious question as will later appear.

Although the testimony taken at the hearing was not extensive, it was not until ten months later (October 27, 1955) that the court entered the order refusing the prayer of the petition. The court justified its order in an accompanying opinion on the basis of George Bair's testimony, concluding therefrom that his failure to pursue his expressed desire for Gerald's custody was due to his inability to pay the Mayteas the sum demanded by Andrew Maytea for Gerald's maintenance and support while the child was living with them. The court accordingly held that there had been no parental abandonment of Gerald.

The Mayteas petitioned the court on November 4, 1955, for a rehearing of the adoption proceeding, setting forth in their petition that George and Carol Bair had, under oath, affirmed to the Navy Department of the United States in the interim that they had placed their minor son, Gerald Bair, age 1½ yrs., in the home of their cousin, Patricia and Andrew Maytea, 1130 Church St., Indiana, Pa., "to be raised and cared for by them until he reaches legal maturity." The petitioners further averred that, "The foregoing affirmed statement of the natural parents was not available when petition for adoption was filed on December 20, 1954, nor when adoption hearing was held before your Honorable Court on January 28, 1955, and only became available recently." It appears inferentially of record that the Bairs' above-stated affirmation to the Navy Department had been made sometime prior to May 18, 1954.

The court granted a rule on the petition for rehearing calling upon the respondents to show cause why the lately discovered evidence should not be made a part of the record, etc. Neither George Bair nor his wife filed any answer to the petition; nor did they otherwise traverse its averments. On December 14,

1955, counsel for the Mayteas, fearful that his clients might be held to be finally concluded by the order of October 27, 1955, if unappealed, took a precautionary appeal therefrom to this court. Then followed an utterly inexcusable example of "the law's delay." The appeal which, in ordinary course, would have appeared on this court's list for the March 1956 Session in Pittsburgh, was continued to the September Session by counsel, the matter obviously not being ripe for appellate review since the court below had not taken any action on the rule which it had granted on November 4, 1955. In the meantime, a motion to quash the appeal was filed by counsel for the respondents on the ground that it was premature. In that situation the appeal, together with the motion to quash, was placed on our list for the September 1956 Session in Pittsburgh. When the case was reached on September 25, 1956, and the situation was orally explained by counsel, we forthwith remanded the record to the court below for the taking of further testimony offered and for a final disposition of the matter. However, nothing was done by the court below throughout that fall; and, on January 1, 1957, the tenure of the judge who had heard the case came to an end by expiration of his term of office.

Thereafter, by petition filed in the court below the Mayteas sought leave to amend their original petition for a rehearing, whereon the court granted a rule on May 21, 1957. The proposed amendment set forth in greater detail, by way of Exhibits A and B, certifications by the officer in charge of "Branch 7, Enlisted Services and Records Div., Bureau of Naval Personnel", U.S.N., showing the disposition which George Bair and his wife, on their own sworn affirmation, had made of their four children, including Gerald. The certification, identified by the petition as Exhibit A,

stated that George Wilson Bair and Carol Jean Bair had placed theirs sons George Wilson Bair, Jr., and Martin Lee Bair, age 6 and 4 years respectively, with the Lake County Welfare Department (Gary, Indiana) for adoption; that they had placed their son, Jerry Harry Bair (Gerald) age 1½ years, in the home of their cousins, Patricia and Andrew Maytea, 1130 Church Street, Indiana, Pennsylvania, *to be raised and cared for by them until he reaches legal maturity;* and that they still retained custody of their minor daughter, Sharon Joyce Bair, age 2½ years, and desired to claim *only* her as their dependent. This affirmation by the Bairs had been made, as already stated, in May of 1954.

The certification, identified as Exhibit B, was a copy of a letter from the Lake County Department of Public Welfare, dated May 18, 1954, addressed to the chief officer of the United States Navy Recruiting Station at Gary, Indiana, the captioned subject matter being George Bair, Sr., who was then apparently an applicant for enlistment in the Navy. The letter of the Welfare Agency reads as follows in presently material part: "As per your request, we submit this statement that George Bair, Sr., and Carol Bair, husband and wife, signed consents on 2-19-54 for the adoptive placement of their two sons, George, b. 6-16-48 and Martin Bair, b. 10-17-50. The above named children were made wards of the Lake County Indiana Department of Public Welfare on 2-24-54, thus giving our agency custody of these children." The letter was signed by "Lois Welton, Supervisor Placement Division."

The rule of May 21, 1957, on the Mayteas' petition for leave to amend was made returnable September 2, 1957; a copy of the petition and rule were served on local counsel for the Bairs who had appeared for them

in the adoption proceeding. A very brief answer was filed on September 3, 1957. The only averments of the petition which the answer purported to deny were the paragraphs relating to the matter contained in the certifications by the Navy Department Officer, with respect to which, the answer merely alleged that "the means of proof are in the exclusive control of petitioners and proof thereof, therefore is demanded." This denial in its implied disclaimer of information. concerning the substance of the certifications was tantamount to an admission. See Rule 1029(b) and (c) of Pennsylvania Rules of Civil Procedure. It is, of course, not open to question that George and Carol Bair had first-hand knowledge as to whether or not they had affirmed, on oath, to the Navy Department in May, 1954, that they had placed their son, Gerald, with their cousins, the Mayteas, to be raised and cared for by them until he had reached legal maturity or that they also knew equally well whether they had placed the older two of their four children with the Lake County Department of Public Welfare, Gary, Indiana, on February 19, 1954, for adoption, as stated by the Welfare Agency's letter in response to the inquiry of the U.S.N. Recruiting Station. The attempt of the respondents' answer to deny their knowledge of the matters set forth in the proposed amendment was little less than an affront to the intelligence of the court.

The matter came on for argument before the court below on the Mayteas' petitions for rehearing and amendment of the record, and the Bairs' brief answer to the later petition. The court thereafter entered an order discharging the rule for a rehearing, holding that the additional evidence contained in the Mayteas' petitions would not have sufficient probative value to change the findings and order of the court of October 27, 1955, refusing a decree of adoption. In the undis-

puted circumstances this conclusion was palpable error. Abandonment of Gerald by his father is the only thing that has ever been disputed in this case; and the proof of that fact is abundantly evident.

From the moment Gerald's mother placed him with the Mayteas she at all times fully assented to their having him to raise as their child. Her letter, of December 23, 1953, addressed to "Dear Pat & Andy & Son" (meaning, of course, Mr. and Mrs. Maytea and son Gerald), she concluded as follows: "I know that he [Gerald] will have everything he will need—and that you will make him wonderful parents—I know he is a happy baby by the way he is with all of you—." At the time of the Bairs' call at the Mayteas' home on February 11, 1954, when George Bair was ostensibly demanding Gerald's custody, Mrs. Bair declared, "Well, I want Patricia and Andy [Mr. and Mrs. Maytea] to have Gerald, because he has a better home than we will ever be able to give him." This statement was testified to at the hearing in the adoption proceeding and was not controverted by either George Bair or his wife. In fact, as already stated, Mrs. Bair did not take the witness stand. Nor has she ever once, since she placed Gerald with the Mayteas in November, 1953, requested or even expressed a desire that he be taken from them.

We indicated earlier that the bona fides of George Bair's professed desire to have Gerald's custody was open to grave suspicion. The record makes that clear beyond cavil. His only request, from the time of the infant's placement with the Mayteas until the hearing on the adoption petition fourteen months later, was when he and his wife called at the Mayteas' home on February 11, 1954. Yet, within two weeks of that time (viz., on February 24, 1954) they placed their two older sons George, Jr., age 6, and Martin, age 4, with the Lake County Department of Public Welfare,

in Gary, Indiana, for adoption and three months after that (in May, 1954) they affirmed on oath to the Navy Department, in pertinent official connection, that they had placed Gerald in the home of the Mayteas "to be raised and cared for by them until he reaches legal maturity."

.. Abandonment, as we recognized in *Davies Adoption Case,* supra, requires an intent to escape parental responsibility, and conduct in effectuation of such intent. See, also, *Hazuka's Case,* supra. Here, we have the deliberately expressed intent of George Bair and his wife to escape parental responsibility for Gerald, coupled with conduct in effectuation thereof, viz., their placing of the child in the Mayteas' keeping to be supported and maintained by them throughout his minority, the only period of his life when anyone would be legally liable for his support.

. The petitioners' burden in respect of George Bair's alleged abandonment of Gerald (the mother's voluntary surrender of him to the Mayteas never having been questioned) was to prove that George Bair intended to escape parental responsibility for the child and in effectuation thereof had failed to support and maintain Gerald for a period of at least six months prior to the institution of the adoption proceeding on December 20, 1954. Certain it is that, except for George Bair's request for Gerald at the time of his call at the Mayteas' home on February 11, 1954, he never made any claim to a parent's right to the child or ever attempted to perform the slightest parental responsibility for his support and maintenance. At the hearing on the adoption petition in January, 1955, Mrs. Patricia Maytea testified as follows: "Q. And since February 11, 1954, George Bair knew that you had that child, is that correct? A. That is correct. Q. Has he ever written to you since February 11, 1954? A. No. Q. Has

he ever come to inquire about the child? A. No. Q. Has he ever offered to support the child? A. No. Q. Has he ever shown any desire to exercise any parental rights over the child since February 11, 1954? A. No." Not only was this not contradicted but it was actually corroborated by George Bair, himself, when, on cross-examination, he testified as follows: "Q. Now, Mr. Bair, from February 11, 1954, until the date of this hearing you knew that the Mayteas had your son? A. That is correct. . . . Q. During that time did you send any maintenance or support for that child? A. I did not. . . . Q. Did you write to the Mayteas about your son during that period from February 11, 1954, on? . . . A. No, I don't write to anybody. Q. Did you make any attempt to exercise any parental rights over this child since February 11, 1954? A. No."

A parent's intent to abandon a child soon becomes evident, especially in the case of an infant, by reason of the inexorable circumstances attending its physical being. "A child's natural needs for food, clothing and shelter demand that someone immediately assume the attendant responsibility which an abandoning parent has ignored; and, that responsibility endures constantly. It does not await the capricious decision of an uncertain parent, perhaps, years later": *Davies Adoption Case,* supra, at pp. 587-588.

Nor was the father's mere assertion at the hearing on the adoption petition that he desired to have the custody of Gerald capable of negating his proven abandonment of his son which had already existed for at least a period of ten months prior to the institution of the adoption proceeding. As we said in *Davies Adoption Case,* supra, at p. 587, "Abandonment is not an ambulatory thing the legal effects of which a delinquent parent may dissipate at will by the expression of a desire for the return of the discarded child." By

merely transposing the word father for mother, and the masculine personal pronoun for the feminine, what we said in *Hazuka's Case,* supra, at p. 435, upon affirming a decree of adoption, is presently apposite. ". . . there is the added fact that [the father], although a wage earner, has never contributed a single penny to the child's support, nor ever offered any constructive plan whereby it could properly be taken care of. It is true that [he] made protestations from time to time of [his] desire to keep the child, but [his] actions, speaking louder than words, show . . . that [he] had no real intention of assuming any parental responsibility in regard to it."

With the parental abandonment of Gerald for a period of well over six months established by evidence which abundantly supplies the requirements of legal sufficiency, it is the welfare of the child in the proposed adoptive home that then becomes the primary and paramount concern of the court, wholly unaffected by either the desire or caprice of the abandoning parents. *Davies Adoption Case,* supra.

As to whether the Mayteas' adoption of Gerald would be in the best interest of the child's welfare the court below said, "Petitioners' counsel strongly urges that petitioners would provide the child with a good home and that its welfare would be promoted by the adoption sought. We feel this may be admitted." In so concluding, the court was but giving effect to the investigation and report which it had requested of a senior worker for the Indiana County Welfare Services, who testified that the home of the petitioners would be a satisfactory adoptive home for the child.

In conclusion, we are impelled to say that it is time that this proceeding be terminated by the entry of a decree of adoption. The child in controversy is now in his sixth year; he has been with the petitioners

and cared for by them, as their child, since he was eleven months old; they are the only parents he has ever known; and their home is and for most of his life has been his only home. "The emotional disturbance to a child that would threaten from its being removed summarily and permanently from familiar and agreeable surroundings and associations, incident to the only parental control and supervision it has ever known, could have a very harmful effect on the child's whole life. Fortunately, the law's regard for a child's welfare does not admit of any such injury or harm being done it." *Davies Adoption Case,* supra, at p. 588. It is only where the law's requirements have not been faithfully pursued, such, for example, as where a natural parent's surrender of her right to her child's custody is obtained by over-reaching, amounting to fraud and deception, that the intimate relation arising between the custodian and the child is to be disregarded in an attempted adoption by the custodian. Cf. *Ashton Adoption Case,* supra. The law favors adoption of children in need of homes who are without proper care by their natural parents; and, once a decree of adoption is entered pursuant to due legal procedure, the reciprocal rights and liabilities of foster parents and their adopted children are as firmly fixed in law as are those of natural parents and their offspring.

The decree of the court below is reversed at the appellees' costs and the record remanded for the entry of a decree of adoption as prayed for by the petitioners.